260 A.2d 444.

ALICE D. OVERTON *vs.* WASHINGTON NATIONAL INSURANCE COMPANY.

JANUARY 7, 1970.

PRESENT: Roberts, C. J., Paolino, Powers, Joslin and Kelleher, JJ.

---

POWERS, J. This is a civil action brought by the named beneficiary to recover the proceeds of an alleged oral contract of term life insurance. The case was tried to a Superior Court justice sitting without a jury. From the final judgment entered pursuant to his decision for the plaintiff, the defendant company seasonably appealed.

On October 20, 1961, Oron B. Overton, Jr., underwent a medical examination in connection with an application to the Metropolitan Life Insurance Company for a $25,000 policy of life insurance. As a result of this examination, Metropolitan offered to issue a policy on a rated-up premium. Overton, however, never accepted the offer. Rather, he entered into negotiations with the instant defendant through its agents Ethier and Sundin. In connection with

these negotiations, a conference was held at Overton's home on November 10, 1961, at which were present Overton, his wife, plaintiff here, and the aforesaid agents Ethier and Sundin.[1] Overton advised the agents that he had made application to Metropolitan; that he had submitted to a medical examination; that Metropolitan had offered to issue the policy for a rated-up premium but that he, Overton, had done nothing about it.

The November 10, 1961, conference centered around Overton's possible purchase of $25,000 life insurance with defendant. The premium and alternate modes of payment were discussed. As a result thereof, an application for a $25,000 policy was partially completed but later destroyed. However, on November 24, 1961, agents Ethier and Sundin went to Overton's place of business where an application for a $10,000 non-medical policy was made out by agent Sundin and signed by Overton. It is agreed that Overton paid no money on November 24th.

The agents had explained to Overton and his wife the several methods by which premiums could be paid. These included a plan whereby Overton would authorize his bank to credit defendant each month out of Overton's checking account referred to as the PAC plan, or the giving by Overton of 12 post-dated checks, one for each month of the ensuing year, which plan was designated PDC. Overton objected to any such method and stated that he wanted to pay the premium on a quarterly basis. In filling out the application Sundin first listed as the method by which premiums would be paid as PAC-PDC but later, when Over-

---

[1]The testimony is in conflict as to whether Mrs. Overton was present and participating. In an analytical review of what he considered the credible evidence, the trial justice found as a fact that she was, and accepted her testimony as to what took place at the conference in question. Having neither overlooked nor misconceived material evidence in making such findings, they are established as fact for purposes of this appeal. *Goldberg* v. *Goldberg*, 105 R. I. 190, 250 A.2d 373.

ton insisted on quarterly payments, crossed out the earlier notation and marked the space provided for indicating quarterly payments. In connection with this change, Sundin had Overton initial the crossing out of the PAC-PDC plans which initialling was in accordance with settled practice.

However, the application, in form, is a multiple-page folding document, divided into two parts. On the back of Part I provision is made for the agent's confidential report. In this latter portion of the application, Sundin made note of Overton's application to Metropolitan and his medical examination in connection therewith, and here also stated that the mode of premium payment would be plan PAC, and the premium filled in was $16.84. These statements relative to the mode of payment and monthly premium were left unaltered, unlike the similar notation to which reference has been made.

The record establishes that, on November 24, 1961, defendant's agent Sundin filled out an application for a non-medical life insurance policy of $10,000; that the application was filled out in the presence of Ethier and Overton, and that the latter signed and delivered said application to the agent on the same day, but paid no premium whatsoever. However, according to Sundin, he again called on Overton at the latter's place of employment on Monday, November 27, 1961, and obtained Overton's check postdated to December 1, 1961, and made payable to defendant in the amount of $16.87. Sundin then turned over the application and check to a cashier at the defendant's local office and the check was deposited to defendant's account. The record further establishes that said application was received at defendant's home office in Evanston, Illinois, on November 29, 1961.

It was Sundin's testimony that, when he called on Overton on November 27, 1961, it was for the purpose of obtaining a down payment or good faith gesture, and that he

explained to Overton that the payment of $16.87 did not bind the company. He further testified that he had asked Overton for $20 to show good faith, but the latter stated that this was more than he was able to pay at the time. Sundin, according to his testimony, then explored with Overton the amount the latter could pay, and the sum of $16.87 was agreed upon but that it had no special significance. This, notwithstanding the admissions of both Sundin and Ethier that $16.87 was the exact premium for one month insurance of $10,000. The trial justice found Sundin's testimony that the sum of $16.87 had been more or less accidentally arrived at was inherently improbable, and rejected it as not credible.

In connection with the November 27, 1961 payment of $16.87, it should be noted that a portion of the application is a detachable conditional premium payment receipt. This is filled out, signed by the agent and delivered to the applicant whenever the appropriate premium is paid at the time the application is delivered. By the terms of this receipt, the applicant is provided with interim coverage pending determination by defendant as to whether the application will be accepted or rejected.[2] Here, the conditional receipt was not filled in, signed, nor delivered to Overton, but was detached by Sundin at some time. In connection therewith, however, there appears question 32 on the application as follows:

"What amount has been paid in exchange for receipt attached?"

In answer to this question, there appears the entry of $16.87; this, Sundin also testified, was made by him, but not on November 24, 1961, when the application was supposedly completed; rather, it was entered by Sundin on November 27, 1961, when he received a post-dated check for that amount. Since, Sundin further testified, that the ap-

[2]See Appendix.

plication calls for quarterly payments, and $16.87 was substantially less than a quarterly paid premium, Overton was not entitled to the interim coverage afforded by a conditional payment receipt, and for this reason was not filled out.

The trial justice noted that on November 24, 1961, Sundin had filled in $16.84, believing when he did that the premium was to be paid monthly in accordance with either plan PAC or PDC. Thus, the trial justice reasoned that, when the agents left with the signed application on November 24, 1961, Overton had no knowledge of any figure other than the $16.84 and must have been advised of the slightly higher premium sometime between November 24, 1961 and the drawing of the post-dated check for $16.87. We shall discuss infra the plaintiff's (widow and beneficiary) testimony regarding the drawing of the post-dated check.

In any event, Overton became ill on December 2, 1961, subsequently entered the hospital and died on December 5, 1961. On December 1, 1961, defendant wrote from its home office to its local agent and requested that Overton be advised of the necessity of submitting to a physical examination. This request, the record indicates, resulted from defendant's obtaining confidential information regarding the report made to Metropolitan in connection with the examination made for that company. Before this request could be communicated to Overton, however, the latter had died. · The plaintiff, presumably having made a demand for payment and been refused, commenced the instant litigation.

In an exhaustive review of the documentary evidence and the testimony he found to be credible, the trial justice found as a fact that the November 24, 1961 application never ripened into a contract on which plaintiff could recover. He pointed out that the application was not accompanied by payment of the premium required to provide in-

terim coverage during the agreed time within which defendant reserved the right to pass upon the application, and that Overton was bound by its terms. (See Appendix.) The defendant having taken steps to preserve its rights within such agreed time, the trial justice concluded, no contract of insurance existed by reason of the November 24, 1961 application.

However, he also found that, subsequent to the execution of the application of November 24, 1961, and prior to December 1, 1961, Overton and defendant, acting through its agent Sundin, entered into a valid oral contract of term insurance for the month of December 1961. This oral contract, he found was separate and apart from the contract contemplated by the November 24, 1961 application. He based this decision on plaintiff's testimony regarding the purpose for which the post-dated check was given, and on inferences that he drew from the course of conduct between Overton and defendant's agent Sundin.

Having substantially related the course of conduct in question, we now turn to a narration of plaintiff's testimony regarding the purpose for which the post-dated check was given. Mrs. Overton testified that some time late in November, but prior to December 1, 1961, her husband drew said post-dated check bearing that date in her presence and told her that it was to cover $10,000 of life insurance for the month of December. She also testified that on December 1, 1961, her husband took occasion to remind her that his life insurance with defendant was in effect as of that date. This testimony was received in evidence over the strenuous objection of defendant, and the validity of its admissibility is among defendant's reasons of appeal.

In connection with its appeal from the judgment entered pursuant to the trial justice's decision, defendant briefed and orally argued four assignments of error. It first contends that interim oral contracts of life insurance are pro-

hibited in this state by reason of the legislatively declared policy set forth in G. L. 1956, §27-4-6. The provision of this section having immediate pertinence provides:

> "No life insurance corporation doing business in this state, nor any agent thereof, shall permit, offer or make any contract of insurance or agreement as to such contract other than as plainly expressed in the policy issued thereon * * *."

There is, however a further provision of the section which, although not directly concerned with the facts of the case at bar, is nevertheless not without significant materiality. It provides:

> " * * * nor shall any such company or any officer, agent, solicitor or representative thereof pay, allow or give, or offer to pay, allow or give, directly or indirectly, as inducement to any person to insure, or give, sell or purchase, or offer to give, sell or purchase as such inducement or in connection with such insurance, any stocks, bonds or other securities of any insurance company or other corporation, association or partnership, or any dividends or profits accruing thereon, or any valuable consideration or inducement whatever not specified in the policy, nor shall any person knowingly receive as such inducement, any rebate of premium, or any special favor or advantage in the dividends or other benefits to accrue thereon, or any paid employment or contract for services of any kind or any valuable consideration or inducement whatever, not specified in the policy * * *."

Clearly, defendant argues, the first quoted provision constitutes a legislative prohibition of oral contracts of life insurance. Since, by the use of the words "policy issued thereon," no contract of life insurance is effectuated until the issuance of the policy. This becomes manifest, it further argues, when the provision relied on is compared to comparable provisions relating to fire and marine insurance, as well as casualty insurance, as contained in §27-6-46 and §27-9-44 respectively.

The first clause in each of the last two cited sections are so similar in verbiage as to be considered identical with the first clause of §27-4-6, the applicable section here, except that, whereas the first clause of §27-4-6 concludes with "policy issued thereon," the clauses in §27-6-46 and §27-9-44 have the added words "or to be issued thereon."

In this manner, defendant would have us believe that the legislature, cognizant of the common practice of immed'ate binders in contracts of fire and marine and casualty insurance, specifically authorized such practice as to fire and marine, as well as casualty, but, certainly by inference, prohibited binding oral contracts of life insurance. We are not so persuaded. Rather, from a realistic reading of §27-4-6 in its entirety, we are convinced that in enacting this section the General Assembly purposed to guard the public against purchasing life insurance on the strength of oral representations of coverage not to be embodied in the policy. That this is so becomes apparent when §27-4-6 is read in pari materia with §27-4-8. This section provides:

> "Any person violating any provision of §§27-4-6 and 27-4-7 shall, upon conviction thereof, be punished by a fine not exceeding five hundred dollars ($500) or by imprisonment not exceeding one (1) year or both."

This imposition of penal sanctions against life insurance companies or their agents making misleading oral representations as inducements to purchase protection not afforded by the policy cannot, in our opinion, be construed as prohibiting an oral contract of term insurance by the terms of which the purchaser would obtain the coverage provided by a policy.

Absent legislative prohibition against such oral contracts, we can perceive no reason in logic why such a contract, if found to have been made, should be vitiated by judicial fiat. The trial justice considered this question, and found such oral contracts were almost universally held to be valid, citing, inter alia, 29 Am. Jur., *Insurance*, §§189, 191 and 195;

69 A.L.R. 559; 69 A.L.R. 565; 2 A.L.R. 2d 951; 2 A.L.R. 2d 955.

However, he also cited *Fliger* v. *Pennsylvania Fire Ins. Co.*, 48 R. I. 274, 137 A. 470, wherein this court held as a matter of law that an oral contract of insurance was valid. This case was concerned with an oral contract of fire insurance and defendant here strenuously argues that this factual distinction is of controlling significance. From a fair reading of *Fliger*, the trial justice concluded that the reasoning in the *Fliger* case was equally applicable to an oral contract of life insurance, a conclusion with which we are in full accord.

Indeed, the instant defendant's provision for providing immediate coverage where the appropriate premium is paid with the application is somewhat akin to an oral contract in that the protection provided covers the period predating the issuance of a policy. See *Allen* v. *Metropolitan Life Ins. Co.*, 44 N. J. 294, 208 A.2d 638; *Gaunt* v. *John Hancock Mut. Life Ins. Co.*, 160 F. 2d 599; *Reynolds* v. *Northwestern Mut. Life Ins. Co.*, 189 Iowa 76, 176 N.W. 207; *Starr* v. *Mutual Life Ins. Co.*, 41 Wash. 228, 83 P. 116.

In this regard, defendant makes much of the fact that no receipt was given to Overton, but, when an otherwise valid oral contract is found to have been made, neglecting to give the insured a receipt for the premium paid must be chargeable to defendant, it being an omission by its agent.

But, defendant further argues, even if oral contracts of life insurance are not against public policy in this state, the trial justice erred in that Sundin was a soliciting salesman rather than an agent with authority to bind his company. In support thereof, defendant cites *Pieri* v. *John Hancock Mut. Life Ins. Co.*, 92 R. I. 303, 168 A.2d 277. We are in full accord with the holding in that case, but defendant's reliance thereon is misplaced. It readily concedes that

the question of whether one standing in the shoes of Sundin is an agent of the company or the insured is one of fact. *Ferla* v. *Commercial Casualty Ins. Co.*, 74 R. I. 190, 59 A.2d 714.

In the instant case, William E. Monroe, defendant's general agent in this state was called by plaintiff as an adverse witness. He testified without contradiction that in November of 1961 both Ethier and Sundin were agents of the defendant, possessed with authority to bind the latter.

The trial justice, in his decision, found as a fact that both Ethier and Sundin were duly authorized agents of defendant with power to bind their company, and, this finding, is supported by competent evidence.

As its third contention, the defendant argues that it was error for the trial justice to receive into evidence plaintiff's testimony regarding statements made to her by her husband relative to the drawing of the post-dated check and his reminder to her on December 1, 1961, that insurance coverage by defendant was in effect as of that day. This was clearly prejudicial, defendant insists, for the reason that, apart from such testimony, the record is barren of any evidence tending to establish an oral contract negotiated between Sundin and Overton. We agree with defendant in this regard and necessarily conclude that the trial justice was in error when he stated that the challenged testimony was merely cumulative and not necessary to support plaintiff's claim.

However, this misconception of evidence by the trial justice is of no assistance to defendant for the reason that we think plaintiff's challenged testimony was propely admitted. It was received by the trial justice as an exception to the hearsay rule under §9-19-11 which provides:

> "A declaration of a deceased person shall not be inadmissible in evidence as hearsay if the court finds that it was made in good faith before the commence-

ment of the action and upon the personal knowledge of the declarant."

The defendant argues to the trial justice, as it did before us, that Overton's statements to his wife could not be testified to by her for the reason that Overton himself could not have given such testimony. This is so, defendant further argues, because the statements attributed to Overton were in derogation of the November 24, 1961 application, hence inadmissible as violative of the parole evidence rule. Whatever persuasive force this contention might have if Overton's statements were made in connection with the November 24th application, however, is not material when it is remembered that Overton's statements to his wife were made regarding an oral contract of insurance for the month of December, and not to the application for insurance for which the premium would be paid quarterly after the first of the year if the November 24th application were accepted.

The defendant's remaining contention likewise lacks merit. It is, that in finding that an oral and separate contract of insurance for the month of December was consummated between defendant, acting through Sundin, and Overton, is at variance with the pleadings. In other words, defendant argues, the trial justice reached out to grant to plaintiff relief for which she was not asking. Paragraphs 7, 8 and 9 of plaintiff's complaint, in addition to making a claim on the basis of the November 24th application, expressly allege that a check dated December 1, 1961, in the amount of $16.87, the conceded premium for one month's insurance, was tendered to, accepted and cashed by defendant as payment for one month's insurance. We think this clearly states a cause of action based on a separate oral contract of insurance and, as heretofore set forth, such additional claim was substantiated by the evidence.

For the reasons stated, the defendant's appeal is denied and dismissed, and the judgment appealed from is affirmed.

## APPENDIX

The provisions of the application in question are:

1. This application and any policy issued in consequence thereof shall constitute the entire contract of insurance and the Company shall not be bound in any way by any statements, promises or information made or given by or to any agent or other person at any time unless the same be reduced to writing and submitted to the Company at its Home Office and made a part of such contract. Only the President, one of the Vice Presidents, the Secretary or the Actuary may make, modify or discharge contracts or waive any of the Company's rights or requirements, and then only in writing.

2. The Insurance applied for in this application shall not become effective until a policy is delivered to and accepted by the Applicant and the entire first premium is actually paid while the Proposed Insured and Applicant for the Purchaser Waiver of Premium Benefit, if any, are in good health, and then only if they have not consulted, been examined, or been treated by a physician or practitioner since the completion of Parts 1 and 2 of this application, and if so delivered to and accepted by the Applicant, the policy shall be deemed to have taken effect as of its Date of Issue. However, if the entire first premium is paid with this application, such insurance shall become effective as provided in and subject to the terms and conditions of the Conditional Premium Receipt bearing the same date and number as this Application.

3. The Company shall have 60 days from the date of this application within which to consider and act upon the application, and if within such period a policy has not been received by the Applicant or if notice of approval or rejection has not been given, then this application shall be deemed to have been declined by the Company.

4. The first insurance year shall begin with the Date of

Issue specified in the policy and the first premium shall maintain the insurance in force only until the next premium-paying date specified in the policy, irrespective of the date of delivery or of premium payment.

5. The Company is authorized to amend this application by making an appropriate notation of any corrections or changes, including any corrections or changes as to amount, classification, plan of insurance or benefits, in the space designated "Home Office Endorsement", and the acceptance of any policy issued on this application shall constitute an acceptance and ratification of any such amendment; provided, however, in those states where written consent is required by statute or insurance department regulation, any amendment as to amount, classification, plan of insurance or benefits shall be made only with the written consent of the Proposed Insured and the Applicant, if other than the Proposed Insured.

*Carroll, Kelly & Murphy, Joseph A. Kelly,* for plaintiff.

*Matthew E. Ward, Dominic F. Cresto,* for defendant.